**BLEICHMAR FONTI & AULD LLP**
Peter E. Borkon (Bar No. 212596)
pborkon@bfalaw.com
555 12th Street, Suite 1600
Oakland, CA 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Plaintiff Steamfitters Local 449*
*Pension & Retirement Security Funds*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO & COMPANY, CHARLES W. SCHARF, C. ALLEN PARKER, TIMOTHY J. SLOAN, and JOHN R. SHREWSBERRY, <br><br> Defendants. | Case No. 3:20-cv-4674 <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** <br><br> **ECF CASE** |

Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds ("Plaintiff"), by and through its counsel, Bleichmar Fonti & Auld LLP, alleges the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of Counsel. This investigation includes, but is not limited to, a review and analysis

of: (i) public filings by Wells Fargo & Company ("Wells Fargo" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of Wells Fargo senior management's conferences with investors and analysts; (iii) press releases and media reports issued by and disseminated by the Company; (iv) analyst reports concerning Wells Fargo; and (v) other public information and data regarding the Company.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or acquired Wells Fargo common stock between February 2, 2018 and March 10, 2020 inclusive (the "Class Period"), against (i) Wells Fargo; (ii) Chief Executive Officer ("CEO") Charles Scharf ("Scharf"); (iii) former Interim CEO C. Allen Parker ("Parker"); (iv) former CEO Timothy J. Sloan ("Sloan"); and (v) Chief Financial Officer ("CFO") John R. Shrewsberry ("Shrewsberry") (collectively "Defendants"), and were damaged thereby, under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Wells Fargo is a financial services company that provides retail, commercial, and corporate banking services.  In 2016, Wells Fargo became embroiled in a high-profile scandal after the public learned that thousands of Company employees opened scores of unauthorized deposit and credit accounts in customers' names.  Subsequently, an independent investigation revealed that the Company's Board of Directors and key executives knew of many of the issues underlying the fraudulent account scandal as far back as 2002.  And in 2017, additional consumer abuses perpetrated by Wells Fargo employees became public, including discrimination against minority borrowers, erroneous foreclosures, the imposition of improper mortgage fees, and unauthorized enrollment in vehicle insurance policies.

3.     In response, state and federal agencies—including the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Consumer Financial Protection Bureau (the "CFPB"), and the Office of the Comptroller of the Currency (the "OCC")—imposed severe oversight measures on the Company, including restrictions and requirements pertaining to Wells Fargo's continued operations and growth.

4.      Specifically, on February 2, 2018, the first day of the Class Period, the Federal Reserve announced an enforcement action against the Company to address oversight and governance failures on the part of the Wells Fargo Board of Directors.  As part of the enforcement action, Wells Fargo entered into a consent order ("Federal Reserve Consent Order") by which the Company committed to comply with the Federal Reserve's directives concerning Board oversight and governance, and the Company's compliance and operational risk management policies.  Significantly, the Federal Reserve restricted Wells Fargo's total asset growth until the Company improves its governance and risk controls.

5.      Approximately two months later, on April 20, 2018, Wells Fargo entered into two additional coordinated consent orders with the CFPB and the OCC (the "CFPB and OCC Consent Orders") (together with the Federal Reserve Consent Order, the "Consent Orders") to address consumer abuses related to mortgage fees and vehicle collateral protection insurance.  Under the CFPB and OCC Consent Orders, Wells Fargo agreed to develop comprehensive plans to strengthen its compliance and risk management and to identify and remediate current and future customer harms.

6.      The Consent Orders came at a time when Wells Fargo was still reeling from the 2016 and 2017 scandals and the resulting damage to the Company's brand.  After the initial scandal broke in 2016, Wells Fargo launched a public relations campaign to repair its reputation and publicly committed to substantial reforms.  As the Consent Orders became public in early 2018, Defendants downplayed their impact and asserted that the required reforms were already well underway.  Defendants then published dozens of public statements touting the Company's reform efforts within its filings with the SEC, conferences with investors and analysts, and press releases, and specifically and repeatedly insisted that Wells Fargo was developing and implementing its reform efforts in compliance with the Consent Orders.

7.      That was false.  Throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Wells Fargo's plans to enhance oversight and governance, improve compliance and operational risk management, and remediate harmed

Class Action Complaint for Violation of the Federal Securities Laws

customers were incomplete and inadequate to prevent future consumer harms; (ii) therefore, Wells Fargo was not in compliance with the Consent Orders; (iii) as a result of Wells Fargo's extended noncompliance with the Consent Orders, the Federal Reserve and the OCC threatened to impose additional supervisory and/or enforcement actions and penalties; and, (iv) additionally, Wells Fargo's remedial measures and operational and compliance risk management remained inadequate to prevent future consumer abuses.  As a result, Defendants' statements about Wells Fargo's business, operations, and risk and compliance policies and procedures were materially false and misleading at all relevant times.

8.     On March 4, 2020, the U.S. House of Representatives Financial Services Committee (the "Financial Services Committee") published the results of a year-long investigation into Wells Fargo in a bombshell 113-page report titled: *The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight*" (the "Report").  Supported by numerous detailed factual findings, the Financial Services Committee concluded that Wells Fargo "continues to struggle to implement effective risk management and remediation programs," the Company's "board and management repeatedly have failed to demonstrate that the Bank can establish compliance management infrastructure capable of preventing abuses," and "Wells Fargo's leadership has been unable to change the Bank's culture."  Significantly, the Report also concluded that Wells Fargo was not in compliance with the Consent Orders.

9.     On this news, Wells Fargo common stock fell $2.50, more than 6%, from $41.40 per share to $38.90 per share on March 5.

10.     In the wake of the Financial Services Committee's report, on March 9, 2020 the Chairwoman of Wells Fargo's Board of Directors Elizabeth Duke ("Duke") and Independent Director James Quigley ("Quigley") resigned from the Board.

11.     On March 11, 2020, Duke and Quigley testified before the Financial Services Committee in a hearing titled, "*Holding Wells Fargo Accountable: Examining the Role of the Board of Directors in the Bank's Egregious Pattern of Consumer Abuses.*"   During their

testimony, the duo endured withering criticism from a bipartisan group of lawmakers for their "dereliction of duty" and lack of urgency regarding Wells Fargo's compliance with the Consent Orders.  Indeed, Duke's testimony made it clear that the Board was fully aware that Wells Fargo's management had repeatedly failed to timely and adequately respond to the Consent Orders and had not implemented effective risk management procedures.  Specifically, Duke testified that the Board had expressed "regular concern" to management about its delays complying with the Consent Orders and its inability to implement the required reforms.  Duke also testified that she believed former Wells Fargo employees should face criminal charges for their roles in perpetrating Wells Fargo's consumer abuses.

12.     On this news, Wells Fargo common stock fell $7.88, more than 22%, from $35.08 per share to $27.20 per share on March 11 and 12.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Wells Fargo's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Wells Fargo's headquarters are located within this District and Defendants conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

18.     Plaintiff provides and distributes pension funds for retired members of the Steamfitters Local 449, a union located in the city of Pittsburg, Pennsylvania.  Plaintiff purchased Wells Fargo common stock during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

19.     Defendant Wells Fargo is a Delaware corporation with its corporate headquarters and principal place of business in San Francisco, California.  Wells Fargo's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC."

20.     Defendant Scharf has served as Wells Fargo's CEO since October 2019.

21.     Defendant Parker served as Wells Fargo's Interim CEO from March 2019 to October 2019, and as Wells Fargo's General Counsel from March 2017 to March 2019 and October 2019 to March 2020.

22.     Defendant Sloan served as Wells Fargo's CEO from October 2016 to March 2019.

23.     Defendant Shrewsberry has served as Wells Fargo's CFO since May 2014.

24.     Defendants Scharf, Parker, Sloan and Shrewsberry are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions at Wells Fargo, possessed the power and authority to control the contents of Wells Fargo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

25.     Each of the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

-6-

Class Action Complaint for Violation of the Federal Securities Laws

representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

26.    For approximately fifteen years, Wells Fargo has inflicted a multitude of consumer abuses on its customers including racial discrimination in lending practices, wrongful foreclosures, unlawful repossession of property, and fraudulently opened accounts.   These pervasive abuses perpetrated against its own customers developed and spread because Wells Fargo and its senior management failed to recognize and/or remedy serious deficiencies within the Company's infrastructure for managing consumer risk and ensuring regulatory compliance. In 2016, government investigations into these and other issues first became public, leading to a series of highly-publicized scandals.

27.    On September 8, 2016, the CFPB, OCC, and the Los Angeles City Attorney collectively fined Wells Fargo $185 million for what the CFPB described as the Company's "widespread illegal practice of secretly opening unauthorized deposit and credit card accounts." Both the CFPB and the OCC also entered into consent orders with Wells Fargo that required the Company to implement substantial reforms (the "2016 Consent Orders").

28.    According to the CFPB, from January 1, 2011 to September 8, 2016, thousands of Wells Fargo employees engaged in improper sales practices related to the Company's aggressive incentive program which encouraged employees to "cross-sell" banking products to Wells Fargo customers.  The CFPB's 2016 consent order required Wells Fargo to submit a plan to remediate harmed customers and directed the Company to engage an independent consultant to review sales practices at its branch locations and to determine whether Wells Fargo's policies and procedures were adequate.

29.    Similarly, the OCC found that Wells Fargo lacked an adequate oversight program to detect and prevent fraudulent sales practices, including an effective process to track customer complaints.  The OCC's 2016 consent order required Wells Fargo to take corrective action to

Class Action Complaint for Violation of the Federal Securities Laws

develop and implement an "enterprise wide sales practices risk management and oversight program to detect and prevent unsafe or unsound sales practices." The OCC also required Wells Fargo to submit a plan to remediate harmed customers and ordered the Company to obtain an independent review of its sales practices.

30.    Subsequently, new details about Wells Fargo's fraudulent sales practices and new consumer abuses came to light in 2017. For example, in March 2017 the OCC revealed that it had uncovered "an extensive and pervasive pattern and practice of discriminatory and illegal credit practices across multiple lines of business within the bank." Then, in April 2017, Wells Fargo published a report detailing the findings of an independent investigation which revealed that Wells Fargo's Board of Directors and executives knew of many of the root causes of the fraudulent accounts scandal as far back as 2002. The independent investigation also revealed the scope of the fraudulent conduct, finding that Wells Fargo employees opened approximately 3.5 million unauthorized accounts. In July 2017, Wells Fargo admitted that it charged more than 500,000 customers for auto insurance on car loans without verifying whether the customers already had insurance. And in October 2017, Wells Fargo admitted that it improperly imposed fees on 110,000 mortgage clients.

**Materially False and Misleading Statements Issued During the Class Period**

31.    On February 2, 2018, the Federal Reserve announced an enforcement action against Wells Fargo related to the Board of Director's corporate governance and risk oversight failures, which facilitated "widespread consumer abuses and compliance breakdowns" within the Company. The enforcement action included the Federal Reserve Consent Order in which Wells Fargo committed to (1) submit a plan to "further enhance the board's effectiveness in carrying out its oversight and governance" of Wells Fargo, and (2) submit a plan to "further improve its firmwide compliance and operational risk management program." The Federal Reserve also imposed severe restrictions on Wells Fargo's total asset growth until the Company submitted, and the Federal Reserve approved, the two required plans.

32.     Defendants attempted to persuade investors that the Company would fully comply with all of the Federal Reserve's directives as it continued to develop and implement effective reforms.  During a Conference Call held the same day, February 2, 2018, to discuss the Federal Reserve Consent Order, Defendant Sloan committed that Wells Fargo will, "submit plans to the Federal Reserve that leverage existing efforts already underway to further enhance the board's effectiveness in carrying out its oversight and governance of the company and further improve the firm-wide compliance and operational risk management program."  Defendant Sloan also represented that Wells Fargo "centralized all risk management functions and are now implementing a fully integrated operating model for risk management across all businesses and staff groups."

33.     On February 13, 2018, during a Financial Services Forum hosted by Credit Suisse AG, Defendant Sloan made similar representations concerning Wells Fargo's compliance, stating, "[w]e have plans in place to address the [Federal Reserve's] concerns and we will meet the deadlines that are in the order itself…. [W]e're taking it seriously and we're going to meet and exceed their expectations."

34.     On March 14, 2018, Wells Fargo filed its annual proxy statement with the SEC on Form DEF 14A prior to its annual shareholders meeting.  Within the proxy statement, Wells Fargo provided shareholders with an update on the status of its reforms and remediation plans and reaffirmed that "the board and senior management are committed to satisfying the requirements of the [Federal Reserve] consent order."  Wells Fargo further stated:

> As part of our transformation, Wells Fargo is committed to a thorough review of the products we offer and the internal procedures we use to get things done. When we uncover anything that may be questionable, we address it and remediate any customers who may have been financially harmed. To strengthen Wells Fargo's corporate culture, we are listening to our team members and inviting outside reviewers to help identify enhancements so we can make sure our culture is consistent across the organization.

35.     On April 3, 2018, Wells Fargo submitted its plans to enhance Board oversight and governance, and to improve compliance and operational risk management to the Federal Reserve as required by the Federal Reserve Consent Order.

-9-

Class Action Complaint for Violation of the Federal Securities Laws

36.     On April 13, 2018, Wells Fargo posted on its website and filed on a Form 8-K with the SEC, its 1Q 18 Quarterly Supplement for the first quarter of 2018 which provided an update regarding the Company's compliance with the Federal Reserve Consent Order. Specifically, Wells Fargo stated, "[w]e take the Consent Order seriously and will work to fully satisfy all of the requirements."

37.     During an Earnings Call held the same day to discuss the Company's first quarter 2018 financial results, Defendant Shrewsberry repeated the Company line and represented that Wells Fargo takes the Federal Reserve Consent Order "seriously and we'll work to fully satisfy all of the consent order's requirements."  On the same call, Defendant Sloan stated:

> As part of our goal of setting the global standard in managing all forms of risk, over the past 19 months, ***we've taken significant actions to strengthen the way we manage operational and compliance risk at Wells Fargo***.  In March, we announced a new risk management organizational design, which is an important step to ensuring that risk management functions operate independently and provide improved and effective oversight of our businesses.

38.     On April 20, 2018, the CFPB and OCC announced enforcement actions and imposed a total of $1 billion in civil penalties on the Company.  The CFPB and OCC found that from September 2013 to February 2017, Wells Fargo employees improperly charged fees to thousands of customers seeking mortgages to extend the period that the customers could receive an interest-rate lock.  Loan officers inconsistently applied the fee policy and improperly charged fees, including when Wells Fargo's own delays created the need for an extension.  The CFPB and OCC also found that between October 2005 and September 2016, Wells Fargo forced duplicative or unnecessary vehicle collateral-protection insurance policies (known as "force-placed insurance") on hundreds of thousands of customers, financing the coverage by adding the costs to the customers' auto-loan balances.  As part of the enforcement action, the CFPB and OCC entered into coordinated consent orders with Wells Fargo which required the Company to submit plans to remediate customers harmed by these improper practices and to develop a plan to identify and remediate future customer harm.  The CFPB and OCC Consent Orders also

required Wells Fargo to develop a company-wide compliance risk management program and a plan to enhance the Company's internal audit program.

39.     On May 4, 2018, Wells Fargo filed its quarterly report with the SEC on Form 10-Q for the first quarter of 2018 ("1Q 2018 10-Q").  The 1Q 2018 10-Q provided an update regarding the Company's compliance with the Federal Reserve Consent Order and disclosed that Wells Fargo had submitted the required plans to the Federal Reserve.  Specifically, Wells Fargo stated:

> As required by the consent order, the Board submitted to the [Federal Reserve] a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the [Federal Reserve] a plan to further improve the Company's compliance and operational risk management program. As part of the review and approval process contemplated by the consent order, the Company will respond to any feedback provided by the [Federal Reserve] regarding the plans, including by making any necessary changes to the plans. The consent order also requires the Company, following the [Federal Reserve's] acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete by September 30, 2018, third-party reviews of the enhancements and improvements provided for in the plans.

40.     Wells Fargo also addressed the CFPB and OCC Consent Orders in the 1Q 2018 10-Q, stating that it will submit "an acceptable enterprise-wide compliance risk management plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders."  The Company also stated that it was engaged in an "effort to identify other areas or instances where customers may have experienced financial harm" and represented that it was "working with our regulatory agencies in this effort."

41.     On May 7, 2018, the Federal Reserve rejected Wells Fargo's submission via a Response Letter that was not made public until it was revealed in the Report in March 2020.  The Federal Reserve informed the Company that the submission was "***materially incomplete***" and "***woefully short***" of the Federal Reserve's expectations.

42.     On June 19, 2018, Wells Fargo submitted plans to the OCC and CFPB to remediate customer harm, develop a compliance risk management program, and enhance the Company's internal audit program as required by the OCC and CFPB Consent Orders.

Class Action Complaint for Violation of the Federal Securities Laws

43.     On July 13, 2018, Wells Fargo published and filed on Form 8-K with the SEC a press release disclosing its results of operations and financial condition for 2Q 18.  In the press release, Defendant Sloan touted Wells Fargo's transformation, stating "[o]ur progress included making further improvements to our compliance and operational risk management programs." During an Earnings Call held the same day to discuss Wells Fargo's quarterly financial results, Defendant Shrewsberry represented that Wells Fargo was "focused on satisfying the requirements of the Federal Reserve, OCC and CFPB consent orders."  On the call, Defendants Sloan and Shrewsberry also discussed Wells Fargo's investment in improving its compliance and operational risk functions.  Defendant Sloan stated that Wells Fargo added "about 2,000 folks … in the risk function year-over-year," which Defendants Shrewsberry characterized as being "disproportionately" invested.

44.     Also on the July 13, 2018 Earnings Call, Defendant Sloan commented on Wells Fargo's compliance with the Federal Reserve Consent Order:

> *[W]e're working very constructively with the Fed*. We've gotten some very thoughtful feedback from them. And our expectation is that sometime in the first half of next year, we'll be able to move through that. I think the point to emphasize there is that our goal is not to just meet expectations so we can get the asset cap lifted. Our goal is to make the fundamental investments and changes that we need to make in how we manage operational and compliance risk at the company. That's the goal, and that's really where we're focused, but no update from a timing standpoint.

45.     On July 24, 2018, the OCC rejected Wells Fargo's submission via a Response Letter that was not made public until it was revealed in the Report in March 2020.  The OCC informed the Company that its submission "*lacks substance and detail in a number of areas*" and instructed Wells Fargo to submit a revised remediation plan and warned that any lengthy delay in "achiev[ing] full compliance" could subject Wells Fargo to "future supervisory and/or enforcement actions."

46.     Egregiously, Defendants continued to misrepresent the status of Wells Fargo's remediation efforts and compliance with the Consent Orders.  For example, on August 3, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the second quarter of 2018

("2Q 2018 10-Q"), in which Wells Fargo reiterated its commitment to improve its compliance and risk management program.   Regarding the Federal Reserve Consent Order, Wells Fargo stated:

> As required by the consent order, the Board submitted to the [Federal Reserve] a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the [Federal Reserve] a plan to further improve the Company's compliance and operational risk management program. The consent order also requires the Company, following the [Federal Reserve's] acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete third-party reviews of the enhancements and improvements provided for in the plans.

47.    Regarding the OCC and CFPB Consent Orders, Wells Fargo stated:

> As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters.

48.    On October 12, 2018, Wells Fargo held an Earnings Call to discuss the Company's third quarter 2018 financial results.   During the call, Defendant Sloan again touted Wells Fargo's efforts to comply with the Consent Orders, stating:

> ***We've had constructive dialogue with our regulators, and we're taking their detailed feedback and making changes across the company***, ***especially in our operational and compliance risk management structure.*** A key milestone in this process is our newly enhanced risk management framework which fundamentally transforms how we manage risk throughout the organization in a comprehensive, integrated, and consistent manner.

49.    On October 31, 2018, Wells Fargo submitted revised plans to the Federal Reserve after requesting and receiving approval for two extensions.

50.    On November 6, 2018, Wells Fargo filed its quarterly report with the SEC on Form 10-Q for the third quarter of 2018 ("3Q 2018 10-Q"), in which Wells Fargo again reiterated

-13-

Class Action Complaint for Violation of the Federal Securities Laws

its commitment to improve its compliance and risk management program.  Regarding the Federal Reserve Consent Order, Wells Fargo stated:

> As required by the consent order, the Board submitted to the [Federal Reserve] a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the [Federal Reserve] a plan to further improve the Company's compliance and operational risk management program. The consent order also requires the Company, following the [Federal Reserve's] acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete third-party reviews of the enhancements and improvements provided for in the plans.

51.     Regarding the OCC and CFPB Consent Orders, Wells Fargo stated:

> As required by the consent orders, the Company submitted to the BCFP and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

52.     Within the 3Q 2018 10-Q, Wells Fargo also discussed its compliance and operational risk, stating: "***We continue to enhance our oversight of operational and compliance risk management, including as required*** by the [Federal Reserve's] February 2, 2018, and the [CFPB]/OCC's April 20, 2018, consent orders."

53.     On January 15, 2019, Wells Fargo held an Earnings Call to discuss the Company's fourth quarter 2018 financial results.  During the call, Defendant Sloan provided an update on the Federal Reserve Consent Order.  He stated, "[t]here are 2 parts to the consent order: governance oversight and compliance and operational risk management.  ***We've made meaningful progress on both,***" and represented that Wells Fargo "***continue[s] to have a constructive dialogue with the Federal Reserve on an ongoing basis to clarify expectations, receive feedback and assess progress.***"

54.     On February 12, 2019, Defendant Shrewsberry participated in a Credit Suisse Financial Services Forum.  During the forum, he commented on Wells Fargo's response to the Federal Reserve Consent Order:

> I think it's taking a little bit longer because it's the first of its kind, and it is sort of an expanding body of work in terms of detail. ***And we're working -- it's very constructive, a lot of back and forth, no disagreement on the general direction we're heading in.*** But there isn't sort of a clear cut case for, first, this happens, then this happens, then that happens. Even though you might have read it that way, we all might've read it that way in the original letter, it's just a little bit more vague in terms of when completion exists. But ***we're making great progress***, and I think the current sense of end of the year is -- seems like a reasonable one while that's happening.

55.     In a March 4, 2019, Quarterly Management Report, the OCC described Wells Fargo's response to date as "***unacceptable***" and found that "***management and Board oversight remain inadequate***."

56.     On March 11, 2019, the Federal Reserve sent a letter to Defendant Sloan in response to Wells Fargo's October 31, 2018 submission.   The Federal Reserve informed Defendant Sloan that Wells Fargo's "***plans to remediate the Order remain materially incomplete***" and admonished and threatened Wells Fargo that it could face additional enforcement actions if its submissions did not improve.

57.     On March 12, 2019, Defendant Sloan testified before the Financial Services Committee during a hearing titled "*Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses.*"  In his opening remarks, Defendant Sloan touted Wells Fargo's corporate reforms and remedial measures:

> ***We have enhanced our three "lines of defense"—front-line risk, independent risk management, and audit—to ensure multiple layers of review and to improve internal oversight.*** We have added more than 3,000 new risk professionals who work every day to ensure that we are conducting our business in the best interests of our customers, and we plan to hire more. Now, we have better visibility into issues as they emerge and can respond to them more quickly.
>
> We have taken a range of other steps to manage and reduce risk. We have reevaluated our products and services, shed riskier investments, and sold or discontinued non-core businesses and activities. And we have hired impressive

new leaders—many from outside the company—to oversee our Risk, Legal, Human Resources, Technology, and Audit groups.

Our Board of Directors has undergone a similar transformation. In the past two and-a-half years, we have added seven new independent directors, who bring expertise in financial services, risk management, human capital management, technology, operations, and reputational risk. … We also improved the reporting and analysis our directors receive, maintained our commitment to the Board's diversity, and further empowered our Board committees to oversee improvements in risk management and corporate culture.

58.     During the question and answer period of his testimony, in response to a question from Chairwoman Waters regarding the OCC and CFPB Consent Orders, Defendant Sloan testified that Wells Fargo was "working very constructively with what we have in place and we are executing that plan that reflects the fundamental changes that I have made since I have become the CEO."  When Chairwoman Waters asked directly "whether or not the bank is in compliance based on reviews that are done by the OCC and the [CFPB]," Defendant Sloan asserted, "***We are in compliance with those plans***."

59.     Additionally, when asked about Wells Fargo's compliance with the Federal Reserve Consent Order, Defendant Sloan suggested that the Company had completed the reforms required by the Federal Reserve.  He specifically stated, "***[a]s part of the consent order with the Fed, they want us to improve the Board and governance oversight, which we have done***" and asserted "***[w]e are significantly improving our compliance and operational risk management***."

60.     When asked whether additional scandals would emerge in the future, Defendant Sloan stated, "***[t]here is nothing else that I am aware of that we haven't disclosed***," adding "the changes that we have implemented, the substantive changes that we have implemented since I've become CEO are going to prevent them from occurring as best we can."  Defendant Sloan explained that Wells Fargo had "checks and balances" in place which made the "likelihood that there would ever be something like a retail sales practices issue happening again at Wells Fargo is very low, if not zero."

61.     Two weeks later, on March 26, 2019, Wells Fargo announced Defendant Sloan's retirement.  During a conference call held on March 28, 2019, Defendant Sloan explained the

timing of his retirement stating, "it has become apparent that the focus on me has become a distraction that impacts our ability to successfully move Wells Fargo forward."  Wells Fargo appointed Defendant Parker Interim CEO.

62.   After Defendant Sloan's departure, Wells Fargo continued to misrepresent its corporate reforms and remedial measures.  On April 12, 2019, the Company held an Earnings Call to discuss Wells Fargo's first quarter 2019 financial results.  During the call, Defendant Parker discussed Wells Fargo's compliance with the Consent Orders, stating:

> I think that it's appropriate to say that there was always a sufficient level of seriousness on the part of our senior management in terms of approaching the Fed consent order. We, early on, marshaled what we thought were the necessary resources to get everything done in a manner of appropriate urgency and thoroughness. As time has gone on, and there's been greater clarity about all the work that's been done and the expectations of the regulators, we've continued to focus on everything that needs to be done. I think above all else, ***I would say to you that the effort that we're talking about, which is enhancing corporate governance protocols, establishing an even stronger risk management framework and achieving true operational excellence just takes a certain amount of time. And we're doing that methodically, but we're also doing it in conjunction with our regulators as they provide us with constant feedback.***

63.   On May 3, 2019, Wells Fargo filed its quarterly report with the SEC on Form 10-Q for the first quarter of 2019 ("1Q 2019 10-Q"), in which the Company yet again reiterated its commitment to improve its compliance and risk management program.  Regarding the Federal Reserve Consent Order, Wells Fargo stated:

> As required by the consent order, the Board submitted to the [Federal Reserve] a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the [Federal Reserve] a plan to further improve the Company's compliance and operational risk management program. The consent order also requires the Company, following the [Federal Reserve's] acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

64.   Regarding the OCC and CFPB Consent Orders, Wells Fargo stated:

> As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the

Class Action Complaint for Violation of the Federal Securities Laws

Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

65.     On May 30, 2019, Defendant Parker participated in a Sanford C Bernstein Strategic Decisions Conference.  During the Conference, Defendant Parker commented on the Federal Reserve Consent Order, stating:

I guess I would start by saying that I don't think that there is a disconnect, certainly not today. I think in terms of the larger notions of what we want to achieve in terms of the Fed consent order, I think we are in agreement with the Fed. And just to refresh everybody's recollection, there are 2 parts to the Fed consent order: One is Corporate Governance, and dramatic changes have been made there over the last year. The goal is to really be a Corporate Governance environment that is best-in-class, and I think we're largely there. …

The second piece of the Fed consent order is operational risk and compliance. And there, I think there is a meeting of the minds in terms of what we need to do, but the task itself is a significant one. A lot of hard work has gone on already and that hard work is going to continue. As I said at first quarter earnings, I can't really put a timetable on that. The single most important thing to know is, it's going to get done, and it's going to get done in a first-rate way.

66.     On July 16, 2019, Wells Fargo held an Earnings Call to discuss the Company's second quarter 2019 financial results.  During the call, Defendant Shrewsberry discussed Wells Fargo's compliance and risk management, stating that management is "highly focused" on the "very urgent requirements in our risk and control environment."  Defendant Shrewsberry also misrepresented Wells Fargo's supposedly revamped risk function, stating:

So the risk department is setting policy and looking into businesses and setting expectations for businesses and testing the businesses, but the businesses are controlling their own risks. . . . I think our credit risks, our market risk, etc. have been historically very strong and continue to be today. So the newer muscle that's being developed in all of the businesses are these control teams, who go process by process, product by product and transaction flow by transaction flow to … try and ensure excellence in what we do. So that we're not generating unexpected operational risk or compliance failures.

-18-

Class Action Complaint for Violation of the Federal Securities Laws

67.     On August 2, 2019, Wells Fargo filed its quarterly report with the SEC on Form 10-Q for the second quarter of 2019 ("2Q 2019 10-Q"), in which the Company again reiterated its commitment to improve its compliance and risk management program.  Regarding the Federal Reserve Consent Order, Wells Fargo stated:

> As required by the consent order, the Board submitted to the [Federal Reserve] a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the [Federal Reserve] a plan to further improve the Company's compliance and operational risk management program. The Company continues to engage with the [Federal Reserve] as the Company works to address the consent order provisions. The consent order also requires the Company, following the [Federal Reserve's] acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

68.     Regarding the OCC and CFPB Consent Orders, Wells Fargo stated:

> As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

69.     On October 15, 2019, Wells Fargo held an Earnings Call to discuss the Company's third quarter 2019 financial results.  During the call, Defendant Parker updated investors on the Company's compliance with the Federal Reserve Consent Order.  He stated, "the feedback that we are getting from the Fed on a constant basis is enabling us to continue to make progress in terms of responding to their expectations."  Regarding Wells Fargo's specific reform efforts, Parker explained, "***we've designed and implemented and we're constantly working to enhance our new risk management framework***.  And that's fundamentally transforming how we manage risk everyday throughout the organization in a way that I would describe as much more comprehensive, integrated and consistent."

Class Action Complaint for Violation of the Federal Securities Laws

70.     On November 1, 2019, Wells Fargo filed its quarterly report with the SEC on Form 10-Q for the third quarter of 2019 ("3Q 2019 10-Q"), in which the Company yet again reiterated its commitment to improve its compliance and risk management program.  Regarding the Federal Reserve Consent Order, Wells Fargo stated:

> As required by the consent order, the Board submitted to the [Federal Reserve] a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the [Federal Reserve] a plan to further improve the Company's compliance and operational risk management program. The Company continues to engage with the [Federal Reserve] as the Company works to address the consent order provisions. The consent order also requires the Company, following the [Federal Reserve's] acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

71.     Regarding the OCC and CFPB Consent Orders, Wells Fargo stated:

> As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

72.     On January 14, 2020, Wells Fargo held an Earnings Call to discuss the Company's fourth quarter 2019 financial results.  During the call, Defendant Scharf stated:

> [W]e must have a strong foundation and move with an extreme sense of urgency to remediate our historical issues.  We still have much more work to do to put these issues behind us, and our future depends on us doing this successfully so we can regain trust with all stakeholders, including our clients, regulators, lawmakers as well as the broader American population. Ultimately, our actions will dictate when that trust is completely regained, not our words.
>
> Given the importance of these issues, I want to say a few more words about our situation, particularly about the challenges that stand in the way of our success and, importantly, the different approach we're taking to address these issues. Providing an honest assessment and clear priorities is critical, and I've given a clear message inside the company that we have not yet met our own expectations or the expectations of others.  We must do what's necessary to put these issues

behind us. Our ability to maximize the value of this great franchise is dependent on us running the company with the highest standards of operational excellence and integrity beyond what we've done to date.

…

We're making significant changes to our management, structure and processes to accomplish our work, changes that will make us more effective. Like any other problem, recognition of the importance and severity is a necessary first step, but this by itself is inadequate. We will take whatever actions are necessary. Our future success depends on resolving these issues, so we will act accordingly.

73.     Defendants' statements identified above in ¶¶ 31 to 72,  were materially false and misleading when made because: (i) Wells Fargo's plans to enhance oversight and governance, improve compliance and operational risk management, and remediate harmed customers were incomplete and inadequate to prevent future consumer harms; (ii) therefore, Wells Fargo was not in compliance with the Consent Orders; (iii) as a result of Wells Fargo's extended noncompliance with the Consent Orders, the Federal Reserve and the OCC threatened to impose additional supervisory and/or enforcement actions and penalties; and, (iv) Wells Fargo's remedial measures and operational and compliance risk management remained inadequate to prevent future consumer abuses.  As a result, Defendants' statements about Wells Fargo's business, operations, and risk and compliance policies and procedures were materially false and misleading at all relevant times.

74.     After markets closed on March 4, 2020, the Financial Services Committee released the Report, which detailed the results of the committee's investigation into Wells Fargo's compliance with the Federal Reserve, OCC, and CFPB Consent Orders, as well as the 2016 Consent Orders.  The Report revealed to investors the Company's abject failure to satisfy the terms of the Consent Orders.  Indeed, the Report disclosed and detailed the repeated rejections of Wells Fargo's submissions under the Consent Orders by the Federal Reserve and the OCC, and highlighted the regulators' frustration with Wells Fargo's poor submissions and delays.

75.     Regarding the Federal Reserve Consent Order, the Report revealed that the Federal Reserve rejected the plans the Company submitted on April 3, 2018 in a May 7, 2018

Class Action Complaint for Violation of the Federal Securities Laws

Response Letter.  The Federal Reserve informed Wells Fargo that the submission was "**woefully short**" of the regulator's expectations and so "**materially incomplete**" that the plans "**cannot be evaluated by [Federal Reserve] staff for their adequacy**."  The Report also revealed some of the incomplete elements the Federal Reserve found in Wells Fargo's submission.  For example, the Federal Reserve found that while "[b]uilding an effective operational risk management program is a key focus of the [Federal Reserve Consent] Order, … **[t]he plans fail to comprehensively address operational risk**."

76.     According to the Report, the Federal Reserve also rejected Wells Fargo's revised October 31, 2018 submission in a March 11, 2019 letter addressed to Defendant Sloan, one day before Defendant Sloan's testimony before the Financial Services Committee.  The Federal Reserve stated that the submission "**remain[ed] materially incomplete**" and still "**lacked fundamental elements necessary to address the issues identified**" in the Federal Reserve Consent Order.  According to the Report, the Federal Reserve staff found the plan "**riddled with errors and discrepancies**, such as indicators for deliverables and 'illogical' timeframes' for achieving future milestones."  The letter also noted that there were "[p]ervasive inaccuracies" in the submission which "in aggregate, weaken the plan's credibility and impede clarity."

77.     The Federal Reserve also admonished Wells Fargo for the poor quality of its first two submissions and threatened additional enforcement:

> Continued failure to submit acceptable plans reflects poorly on the firm, and negatively influences supervisors' view of the board and senior management's capacity to effectively manage and govern the firm. The [Federal Reserve] expects the firm to take the time necessary to develop its next plans and ensure greater quality control. **A third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions.**

78.     The Report also revealed that Wells Fargo failed to comply with the coordinated OCC and CFPB Consent Orders.  The OCC rejected Wells Fargo's June 19, 2018 submission via a Response Letter on July 24, 2018, informing the Company that its remediation plan "**lacks substance and detail**" and instructed the Company to resubmit its plan.  As an example, the OCC stated, "As written, the plan does not provide full remediation for all impacted customers, and,

-22-

Class Action Complaint for Violation of the Federal Securities Laws

in some instances, the bank's initial plan results in inconsistent and potentially unfair treatment of customers who experienced similar harms."   The OCC's letter also warned that continued failure to submit adequate plans could result in future action, stating:

> The length of time a Bank takes to achieve full compliance with all provisions of an enforcement action is a factor in the OCC's determination of any future supervisory and/or enforcement actions. Management's action plan and timeframes for completion should demonstrate prompt corrective actions that are appropriately designed and will result in effective and sustainable resolution of the longstanding, uncorrected issues that are included in this [consent order].

79.     The Report also revealed that on March 4, 2019, in an OCC Quarterly Management Report, the OCC deemed Wells Fargo's submissions "***unacceptable***" and concluded that "***management and Board oversight remain*** inadequate."   The OCC also noted that "the vast majority of progress appears to come after repeated pressure by the regulators, calling out missed deadlines, failed validations, and poor quality action plans," and demanded that Wells Fargo "demonstrate willingness and ability to implement and maintain effective corporation governance and risk management that span the enterprise."

80.     Finally, the Financial Services Committee concluded that Wells Fargo's risk management infrastructure remains broken and inadequate to prevent future harm to consumers. As a result, the Report concluded that "time has come for Congress to compel regulators to be more aggressive with regard to megabanks like Wells Fargo in using the supervisory tools and sanctions available to them."   Moreover, the Report recommended that Congress "consider legislation mandating that regulators immediately direct a recidivist megabank like Wells Fargo to remove complacent and ineffective directors … and compel regulators to either (a) downsize Wells Fargo [] or (b) wind down the bank…"

81.     As a result of this news, Wells Fargo's common stock price per share dropped from $41.40 per share at the close of trading on March 4, 2020, to $38.90 per share on March 5, 2020, and the Class was damaged thereby.

Class Action Complaint for Violation of the Federal Securities Laws

82.     On March 11, 2020, former Wells Fargo Chairwoman Duke and Director Quigley testified before the Financial Services Committee two days after they resigned from the Board on the heels of the Report.  Duke and Quigley endured scathing criticism from lawmakers for the Board's failed oversight and lack of urgency in its dealings with Wells Fargo management's inability to timely and adequately comply with the Consent Orders.  For example, Rep. Patrick McHenry derided the "severe deficiencies and management practices that were unique to Wells Fargo and [the] unique failures of this Board of Directors," while Chairwoman Waters accused Duke and Quigley of "dereliction of duty."

83.     In her testimony, Duke essentially admitted as much when she told the Financial Services Committee that the Board expressed "regular concern" to management about its repeated delays in responding to the Consent Orders and its inability to implement adequate risk management improvements.  Despite its "concern," the Board was unable to ensure management took appropriate action.  Rep. Nydia Velazquez stated that the Board was not effective because its "priority" was "not actually fixing the risk management problems at the bank or holding senior management accountable" for their failures.  Indeed, multiple lawmakers criticized Duke and Quigley for not removing Defendant Sloan sooner than March 2019 due to his poor performance.

84.     During the hearing, several lawmakers accused Wells Fargo of running a "criminal enterprise."  Rep. Al Green stated, "At some point the long arm of the law has to reach Wells Fargo."  And Rep. Warren Davidson added, "It wasn't the ATMs, it wasn't the conference rooms that committed crimes. Someone that worked for Wells Fargo committed crimes."  In her testimony, Duke agreed that some former Wells Fargo employees should face criminal charges for their roles in the Company's consumer abuses, while Quigley refused to comment on the matter.

85.     As a result of this news, Wells Fargo's common stock price per share dropped from $35.08 per share at the close of trading on March 10, 2020, to $27.20 per share on March 12, 2020, and the Class was damaged thereby.

**LOSS CAUSATION**

86.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Wells Fargo common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on March 4, 2020 and March 11, 2020, as alleged herein, the price of Wells Fargo common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of its purchases of Wells Fargo common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

87.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wells Fargo common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Wells Fargo and their families and affiliates.

88.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of June 30, 2020, there were more than 4 billion shares of Wells Fargo stock outstanding, owned by at least thousands of investors.

89.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.  Whether Defendants violated the Exchange Act;

B.  Whether Defendants omitted and/or misrepresented material facts;

Class Action Complaint for Violation of the Federal Securities Laws

C.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.  Whether the price of Wells Fargo's common stock was artificially inflated;

F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.  The extent of damage sustained by Class members and the appropriate measure of damages.

90.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

91.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

92.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

93.     Wells Fargo's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

94.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of Wells Fargo who knew that the statement was false.

95.     None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic

performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## **PRESUMPTION OF RELIANCE**

96.    At all relevant times, the market for Wells Fargo's common stock was an efficient market for the following reasons, among others:

A.  Wells Fargo stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

B.  As a regulated issuer, Wells Fargo filed periodic public reports with the SEC;

C.  Wells Fargo regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.  Wells Fargo was followed by many securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

97.    As a result of the foregoing, the market for Wells Fargo common stock promptly digested current information regarding Wells Fargo from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of Wells Fargo's common stock during the Class Period suffered similar injury through their purchase of Wells Fargo common stock at artificially inflated prices and the presumption of reliance applies.

98.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

99.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

100.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Wells Fargo common stock at artificially inflated prices.

101.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Wells Fargo common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

103.     During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Wells Fargo's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

105.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wells Fargo's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

106.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

107.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

108.    Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

109.    The Individual Defendants acted as controlling persons of Wells Fargo within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Wells Fargo, the Individual Defendants had the power and ability to control the actions of Wells Fargo and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

110.    **WHEREFORE**, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

111. Plaintiff demands a jury trial.

Dated: July 13, 2020                                    Respectfully submitted,

                                                        **BLEICHMAR FONTI & AULD LLP**

                                                        /s/ *Peter E. Borkon*
                                                        Peter E. Borkon (Bar No. 212596)
                                                        555 12th Street, Suite 1600
                                                        Oakland, CA 94607
                                                        Telephone: (415) 445-4003
                                                        Facsimile: (415) 445-4020
                                                        pborkon@bfalaw.com

                                                        Javier Bleichmar (*pro hac vice* to be filed)
                                                        Nancy A. Kulesa (*pro hac vice* to be filed)
                                                        Nicholas J. Dennany (*pro hac vice* to be filed)
                                                        7 Times Square, 27th Floor
                                                        New York, New York 10036
                                                        Telephone: (212) 789-1340
                                                        Facsimile: (212) 205-3960
                                                        jbleichmar@bfalaw.com
                                                        nkulesa@bfalaw.com
                                                        ndennany@bfalaw.com

                                                        *Counsel for Plaintiff Steamfitters Local 449*
                                                        *Pension & Retirement Security Funds*

Class Action Complaint for Violation of the Federal Securities Laws